## THE SILVIA.

(District Court, E. D. New York. April 12, 1924.)

**1. Shipping ⟨⟩81(1)—Injury to moored boat from swells of passing steamer held due to faults of both vessels.**

Damage to a digger boat, lying alongside the rough granite bulkhead on the Manhattan side of East River, discharging a coal barge, by pounding against the bulkhead, proximately due to swells from a steamer passing up on a flood tide on the western side of the channel, and the steamer *held* in fault for negligently going at excessive speed. The digger also *held* in fault in that, while seaworthy for her occupation, her bottom was old and tender, and required extraordinary precaution, which was not taken, to safeguard her from just such injury, and for the further reason that half an hour after her injury, and after she commenced to fill, she was negligently cast loose and allowed to drift, greatly increasing the damage.

**2. Shipping ⟨⟩81(1) — Duty of steamer and moored craft to use reasonable care to prevent injury from swells.**

The duty rests on a steamer, navigating near the side of East River, where smaller craft are moored, to use reasonable care to prevent their injury from its swells, and a corresponding duty on the moored vessels to see that they are in such condition and so moored as to minimize their danger from such cause.

**3. Shipping ⟨⟩81(1)—Act done after 30 minutes to consider not excusable as error in extremis.**

The action of the engineer of a boat moored in East River, which had been injured by being bumped against a stone bulkhead and had begun to fill, in casting her loose on a flood tide half an hour after the injury, causing her to suffer further damage, is not excusable as an error of judgment in extremis, but was an act of negligence.

**4. Shipping ⟨⟩86(3)—Court cannot apportion damages according to degree of blame.**

Where two vessels were both in fault for an injury, the court cannot apportion the damages according to the degree of blame, but must divide the loss equally.

In Admiralty. Suit by Graney Bros., Inc., against the steamship Silvia. Decree for libelant for half damages.

See, also, 2 F.(2d) 105.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (William H. McGrann and William H. Arnold, both of New York City, of counsel), for claimant.

INCH, District Judge. Libelant, Graney Bros., Inc., was at the times hereafter mentioned the owner of a digger known as the Graney Bros. No. 4. On August 18, 1923, about 11:30 in the morning, this vessel was lying alongside a city dock, consisting of a rough granite bulkhead at a point between Seventy-Second and Seventy-Third streets, East River, borough of Manhattan, city of New York. On the other or river side of her was a coal barge, half full of coal. It was flood tide. About that time the claimant's passenger and freight single screw steamer Silvia, of about 3,500 tons, passed by, on her way from her berth at the foot of Java street, Greenpoint, bound for Halifax. Shortly afterward the digger commenced to fill.

The libelant's libel alleges in substance that it was the Silvia that caused the damages sustained by this Graney No. 4, and claims they amount to approximately $30,-000. Specific grounds for this charge are that the pilot, master, and lookout of the Silvia were incompetent and careless; that the Silvia went too fast and too close to the Graney No. 4, whereby excessive suction and swells were caused, which directly resulted in the pounding of the digger against this stone bulkhead, and thus caused the great damage she undoubtedly sustained; and that neither the libelant nor those in charge of the digger were at fault or contributed in any way to cause this unfortunate accident.

The claimant duly answered, putting in issue all of these claims of libelant, and in substance alleged that the Silvia was not to blame, that those in charge of her were competent and careful, and that the reason that the Graney No. 4 was damaged was that she was improperly equipped and moored and that those in charge of her were incompetent and negligent; that the Graney No. 4 had been allowed carelessly to reach that condition where she could not withstand the ordinary contingencies of navigation and the work in which she was engaged; that the ordinary swells of some passing vessel, or even perhaps the very work she was engaged in, that of unloading crushed stone, and later coal from barges to the bulkhead, with its regular tilting from side to side as the bucket swung from barge to bulkhead

and back again, and the possible rubbing of her bottom against the rough edges of the granite bulkhead was the cause of her damage.

[1] The burden is on libelant to prove by a preponderance of evidence that the proximate cause of damage to its boat was the negligence of the Silvia, and that such negligence was not caused by fault in or on the part of libelant. The greatest latitude was allowed upon the trial, in order that each party might have opportunity to produce all facts which might be helpful to a decision. Counsel for both parties have submitted skillful and exhaustive briefs and the case is one largely of fact.

First, as to the liability, if any, of the Silvia: I am convinced that, if any damage was caused by a passing vessel, it was caused by swells, from the Silvia. As to the fact that the Graney No. 4 sustained serious damage there can be no dispute. I discount the efforts of certain witnesses to have it appear that almost a tidal wave rolled against the Graney No. 4. Such description is plainly exaggerated, nor is it necessary to find such a condition. I am convinced, however, that libelant has established by a fair preponderance of evidence that at the time in question the Silvia was carelessly navigated at too great a speed, considering how near she was to a boat like the Graney, moored as she was against what was known to the pilot in charge of the Silvia to be a granite bulkhead.

Taking it for granted that the witnesses for libelant testified to facts tending to sustain this conclusion, I also believe that certain witnesses of claimant sustain to a considerable degree such contention. These witnesses were the captain and the pilot of the Silvia, in charge of her at the time.

The testimony of Duder, the lookout of the Silvia, requires little comment. He testified he was in the bow, and could not see the swells, if any, flowing from the stern, and either deliberately or by reason of lack of memory persisted in saying that the only vessel ahead while passing up the river, that he remembered, was a tug going in the same direction and at great speed, apparently saying this in an effort to show that it was this tug that caused the damage. Both the captain and the pilot clearly remembered, however, not only seeing other tugs and tows, which it would seem it was the duty of the lookout to have seen, and which he must have remembered. These witnesses also testified to the necessity of going to the west of the middle of the river in order to pass such vessels.

The next witness of claimant was Mitchell, the captain. He states that they were going full ahead for a short time just before entering Hell Gate at 11:29 a. m.; that they went full ahead to give the ship steerageway to maneuver around a float that was there proceeding along just ahead of it; that they were a shade on the New York side of the channel, passing up the river between Blackwells Island and the Manhattan side; that they were going with a very strong flood tide and about 10 miles an hour over the land, and then made this answer: "Q. What are the swell-raising tendencies of this vessel? A. At the rate we were traveling that morning, half slow and half, she created no swells at all. She does not create any swells until she gets up to *full speed, to cause any damage whatsoever*.

While there is no doubt that prior to the time in question, and before the Silvia had passed the Graney No. 4, there were occasionally variations of speed, yet thus, according to her captain, the Silvia at full speed created considerable swells, sufficient to cause some damage. This captain also stated that there were several vessels or tows, etc., along Blackwells Island side, and that "we were forced to take them on our starboard side."

It might be helpful here to give a brief description of the locality where this accident occurred. From opposite Fiftieth street and extending to about Eighty-Sixth street, Blackwells Island divides the East River into two branches. This accident happened on the Manhattan branch. The river on the Manhattan branch is about 800 feet wide at Seventy-Second street. This would mean that mid-channel is about 400 feet. In order to pass vessels that were in mid-channel, therefore, there must be a space of safety between the Silvia and such vessels, which was testified to as being in the neighborhood of 100 feet, so that approximately, taking the ordinary width of tows, etc., and with the space necessary for safe passing, the Silvia must have been, when she took the barges on her starboard side, at least 200 to 250 feet from the Manhattan shore, according to the captain's figures, and I believe she was nearer.

Along the Manhattan side, between Seventy-Second and Seventy-Third street, and extending both downtown and uptown, is this public rough granite bulkhead. It is unnecessary to describe it in detail. Suffice

it to say that it is simply a wall alongside the river, and consists of roughly finished granite blocks set on a concrete foundation, very strong, and plainly dangerous to a boat with a tender or rotten bottom or sides. Berths alongside this wall are not like those in slips, but, on the contrary, the water is very deep at high tide, and a vessel moored there lies practically out in the river and exposed to the full sweep of the tide as it passes up to Hell Gate.

We return to the testimony of the pilot, Scofield, the last one of these three officers who were operating the Silvia. In the first place, this pilot testified that he was well aware of the condition of things where the Graney No. 4 was moored. He of course did not remember any particular barge, nor does it seem to me that it is necessary to find that he knew that the Graney No. 4 was there, or any other particular barge, so long as the ship was operated without due care for those which might have been there, in the absence of a denial by him that the Graney No. 4 or any other barge was there.

Pilot Scofield says that he was compelled to go on the New York side when Blackwells Island was reached; that he just cleared certain tows, and proceeded slow to half speed to about Eighty-Third street, and then there was another tow ahead of him about Eighty-Ninth street, "and I went full speed then, so as to pass that tow before we approached Hell Gate, for the safety of the ship; we had to have some steerage way"; that he was going about 4 or 5 knots through the water, and that the tide was going about 4 or 5 knots; that he might have been 50 feet west of the middle of the channel; when asked how fast did he go through there usually, he answered "that it is according to circumstances; sometimes she can go faster than other times, and sometimes we want to pass somebody, so as to clear them, to round the head of the river in Hell Gate, so as not to come together with it." He was also questioned in regard to speed in passing tows, which, on the fair assumption that swells spread out on both sides, is significant here; and in answer to such a question he answered as follows: "Q. But you can't go full speed? A. Oh, not full speed; *if you did, you would shave the sea over the top of them and burst the lines.*"

I believe it is fair to find from this that this pilot well knew that, when she went full speed, she created considerable swells. Again, this witness was asked in regard to

this last tug and tow, which he had previously mentioned as being about Eighty-Ninth street: "Q. You say you passed the Standard Oil tug and tow at full speed? A. *No, I went full speed;* but before I got to her I saw I had her safe; I slowed the ship again. Q. In other words, *before you approached her you went full speed?* A. When I was coming on to her, *before I got to her.*"

This plainly indicates that it was his practice, in endeavoring to pass a tug and tow, to go full speed before such vessel was reached, and then slow down as the actual passing occurred, to avoid the very swells already testified to by both captain and pilot. Thus we have the Graney No. 4 laying alongside this stone wall, between Seventy-Second and Seventy-Third streets, and the pilot testifying that it was about Eighty-Third street that he went full speed ahead, in order to catch the tug and tow that was at Eighty-Ninth street. Due allowance should be made for a witness thus testifying, to the best of his ability, months after an accident, and of which apparently he was unaware at the time it happened. Under the conflict of testimony thus apparently arising, small things are important, and we consider what is probable.

The libelant produced several witnesses who testified that the Silvia passed Seventy-Second to Seventy-Third street at a rate of speed, according to some of 15 knots; but I find 10 to 12 knots is a fair average of all the witnesses, and if this pilot was mistaken somewhat as to the exact location where this last tug and tow was, he evidently proceeded to go full speed six or seven blocks before the tug was reached, so that, when the affirmative testimony of witnesses for libelant is considered, in which they saw the Silvia pass the point between Seventy-Second and Seventy-Third street at high speed, it is important to see if this pilot was not mistaken as to the exact place. Accordingly we find this significant statement in his testimony: "Q. As you went between Blackwells Island and the Manhattan side, did you pass a tugboat with some scow in tow, you passing it on your starboard side, went between Blackwells Island and the Manhattan shore, somewhere between Seventy-Second and the north side of Blackwells Island? A. *I think I passed the last tow and right in that vicinity,* around Seventy-Third street, about that."

Taking, therefore, all the testimony together, it is apparent that even the officers

of the Silvia considered it dangerous for her to pass at full speed, even at a distance of 100 feet, a tug and tow; that it is fairly probable, when all the testimony is read, that the time when the scrap log shows full speed and the occasion arose for same, in approaching for the purpose of getting ahead of and on the starboard side of this tug and tow, it was in the neighborhood of Seventy-Third street. All the witnesses testified that the Silvia was west of the middle, and when witnesses of the libelant testified that the Silvia came within 150 feet of this stone wall they were not far out of the way. It seems to me, therefore, that the libelant has sustained the burden resting on it of showing that the Silvia was operated in a careless manner when, if claimant's pilot is to be believed, he knew at the time the condition existing at the place where the Graney No. 4 was moored.

[2] The truth is, and it was testified to, that a captain sailing a ship of the size of the Silvia up a thoroughfare such as the East River is naturally concerned more with the craft in the water than that moored along the bank, and yet they must not be carelessly forgotten. A speed in midstream may not be careless, although that speed near the shore would be careless. The East River does not exist solely for barges and lighters, important as they are, nor does it exist solely for the larger steamer. The rights of all must be respected, and each captain must use reasonable care in the management of his vessel not to do that which is reasonably certain to cause damage in the ordinary cause and effect and sequence of events. The duty also rests on the smaller craft moored alongside of the bank, that they be moored in a reasonably safe way, and that they be maintained in such reasonably good condition as to withstand the ordinary knocks and emergencies which are so constantly to be encountered, and which there is every reason to apprehend, and that those in charge be ordinarily experienced and competent.

There was therefore a duty resting on claimant and a duty resting on libelant. I find that claimant's duty was not performed. The next question accordingly is: Was the breach of this duty by claimant the proximate cause of the injury suffered by the Graney No. 4? I think it was. I am quite certain that the swells of the Silvia, that reached the stone bulkhead after she passed so close and at such a speed, were greater than those ordinarily to be expected. It

is not necessary to find the exact height, but that they struck the Graney No. 4 heavily I am convinced. Finding, as I do elsewhere in this decision, that, while seaworthy in the sense of that term, the Graney No. 4 had a tender bottom, which, while sufficient to withstand ordinary knocks, yielded readily to extraordinary blows, especially when moored alongside a rough granite bulkhead, and, taking all the circumstances before and at the time into consideration, I am fairly certain that the hole in the Graney No. 4's bottom was caused by this series of swells from the Silvia. It fairly appears that such swells would be a competent producing cause for the making of the hole and the water pouring through this hole, which led the Graney No. 4 to commence to sink.

I have carefully read all the cases submitted by both parties, and find none that in my opinion conflicts with this decision. The case of The New York, relied on by claimant, can be readily distinguished, it appears to me, for the reason that in The New York the libelant really relied on mere proof of the accident to prove negligence. In the case here there is direct and other proof to an act of carelessness which was a competent producing cause of the accident.

The final question is: Was the duty resting on libelant duly performed by it? It seems to me that the place where the Graney No. 4 was moored, although a public dock, called for a degree of care which might not have been required if the bulkhead had been of wood. In fact, this is one of the facts on which is based the carelessness of the Silvia. There is testimony that the Graney No. 4 was close to this stone bulkhead. There is also a great deal of testimony in regard to lines, but in my opinion the only lines that were out from the Graney No. 4 to the bulkhead were three in number, one forward, one aft, and a stern breast line. There were no employees apparently on the coal boat, and the only two persons on the Graney No. 4 were a fireman, who seemed to be totally occupied in stoking the engine, and the engineer, who seemed to be solely occupied with working his bucket. These witnesses testified that they put out six lines when the Graney No. 4 arrived at the bulkhead on August 13, and so far as I can find there is no testimony that they touched them afterwards, and yet, when Mr. Graney, one of the officers of libelant, visited the Graney No. 4 on August 15, two days afterward, he only saw three lines.

The truth is that one might even guess

that when this accident occurred almost all lines had been taken up, as libelant's witness testified they were to quit at 12 o'clock, and the tug was already there to tow them away. They did not intend to finish the unloading of the coal boat, and the time that the accident happened was about half past 11. No one seems to have seen even the bursting of any of the lines to the shore from the Graney No. 4, except the engineer, who said he cut two, and even he was unable to testify that he saw any remnants of any lines on the bitts on the bulkhead. The explanation was given that some one must have taken these remnants. However, one cannot guess, and in view of the direct testimony, and avoiding what might appear to be speculation, I find that the evidence in the case indicates three lines from the Graney No. 4 to the bulkhead.

It is not placing too heavy a burden upon those in charge of vessels like the Graney No. 4 to say that, moored as she was, they must use reasonable care to be on the lookout for swells from passing craft, large and small, particularly alongside an open stone wall, with deep water, and yet there is no evidence that any one on the Graney No. 4 did anything to perform this duty. Every seaman knows that a vessel can often be protected from damage by hauling of the lines when waves come, or at least making an attempt to do so; but nothing of the kind occurred here, and in fact the fireman, Farrell, after feeling the bump, which threw him against the bunker, left the Graney No. 4 as soon as he saw the water coming in, in order, he says, to telephone for help, but he did not return until the Graney No. 4 had gone up the river, and although a half hour intervened.

[3] The engineer, Monticelli, testified *he saw the Silvia coming up,* but he gave no warning, but calmly kept on working, and after he says things had quieted down he still kept on working, and hoisted eight or nine buckets from the coal barge to the dock, all this during the course of at least 10 minutes, and then descending to the deck, and discovering the water, and during a period of at least 20 minutes, made no effort to put out further lines, which might have held her, and which I believe were available. In order to dispose of these lines, the engineer said they broke, although, as I have said, no one testified they saw any part of the lines afterward. Then this engineer came ashore with an ax and deliberately cut the only lines holding the Graney No. 4 to the bulkhead.

The libelant excuses such act as an error of judgment; that it was an act in extremis. I cannot agree that the circumstances of this case indicate any ground for such contention. It should have been plain to the engineer that, with a flood tide sweeping along this stone wall, nothing whatever was there to prevent what was plainly indicated would occur and did occur, once the lines were cut, in the absence of putting on other lines, or even if there were no lines to put on, while the lines out were still holding. The coal barge was still there, making a convenient resting place for the derrick of the digger, and both boats were floating. Certainly, with the length of time, 30 minutes, in which to consider all these plainly indicated conditions, the act of the engineer can only be excused on the ground that he was careless. There was no such sudden emergency here which the law requires to exist, and which, when the court goes back to the original situation, indicates two courses, either of which, in the instant allowed for reflection, might seem fairly to indicate a step in avoidance of damage or danger. Here there was an appreciable time in which to carefully consider all the circumstances and they were exceedingly plain. If under such circumstances a careless act is excused on the ground that it was simply an error of judgment, in extremis, then every case of negligence could be excused on this exceptional ground, and negligence would be proved as evidence of prudence. The law in regard to errors of judgment is based on different circumstances from those here indicated.

"The injured person must be placed in such a position that he has to choose on the instant in the face of the impending peril. If there is time for him by the exercise of reasonable care to withdraw to a place of safety, he cannot recover if he does not do so. * * * If such emergency is brought about by the person injured negligently placing himself in a position of peril, he cannot recover." 29 Cyc. 522.

"The reason is that it is not right to expect superhuman presence of mind, * * * but the vessel which appeals to this doctrine must show that she was not in fault herself." Hughes on Admiralty, p. 332.

"If the plaintiff was placed, by want of care of the defendant, in such a position that at the moment, and in the face of a great and threatening peril, he was obliged to choose between two hazards, and he makes such choice as a person of ordinary prudence and care, placed in the same situation,

might make, and is thereby injured, the fact that, if he had chosen the other hazard, he would have escaped injury, does not relieve the defendant from liability for its own negligence." Haff v. Railway Co. (C. C.) 14 Fed. 558, at page 562.

The above extracts are quoted, not as accurately applying to the facts in this case, but as indicating the general rule applicable to this kind of defense invoked by libelant, and when applied to the facts in this case show plainly that such doctrine cannot be relied on here. Most accidents happen unexpectedly, and no doubt the Graney No. 4 made water rapidly; but an opportunity of 30 minutes was presented here to do something which an ordinary competent seaman would have thought of and done, or attempted to do; but during this long time apparently nothing was done but to telephone for help, and finally cut the lines, letting the whole thing go adrift up the river.

There is some testimony that the lines might have broken anyhow, but they had not done so. There was no attempt to put on more lines. There is also testimony that the lines were cut in the belief that this would allow the digger to sink. Aside, however, from all the circumstances above mentioned, there was ample time given for this employee to have consulted with competent seamen present on the tug, and possibly elsewhere, and in various ways to show an exercise of judgment based on all these conditions, but nothing of this kind appears.

That the damage was tremendously increased by this careless act of the engineer goes without saying, as will be shown by a brief narrative of what subsequently happened. As soon as the Graney No. 4 was cut loose, she started on her remarkable trip. She first went along this stone wall and out towards the middle of the stream, resting her superstructure on the coal boat. When she had gone a few squares, this coal boat was taken from her by the tug Dictator, and she proceeded alone up the channel. She then went to a point above Horns Hook, where she "fetched up" and apparently got rid of considerable of her equipment. Thus lightened, she then decided to go up through Hell Gate to about Lawrence Point, where she rested for a while, and then made the return trip, down through Hell Gate and the East River, to Stanton street, near the Williamsburg Bridge, where she entered an unoccupied slip and was found the next afternoon, a total wreck.

As to the condition of the Graney No. 4, but a few words need be said. She had

been working right along without trouble. The evidence shows that she was a converted scow or barge, that had been lying for about two years at a place in New Jersey, before she was converted into a digger; two-thirds of this time she lay in the water. There is evidence that her bottom planks, which ran from side to side, were not examined or changed for several years. She apparently had never been in dry dock, and when she had been so lying for about two years she was sold to libelant. Libelant had her sides repaired and a new deck put on her, and other changes apparently made, that put her in fairly good condition; she was then taken to a company which installed the mast, boom, and bucket, etc. Neither during the course of these repairs at the shipyard, nor when her hoisting apparatus was installed, is there any evidence that these bottom planks were examined. About April, 1923, she went into commission, and thereafter worked almost every day, mostly unloading paving blocks, sand, stone, and coal; she had therefore been lying two years in New Jersey prior to April, 1923, without her bottom being examined, and had since been busily engaged four or five months in heavy work.

The testimony of Mr. Bennett, naval architect, is that he examined her bottom after the accident, and that he found a certain portion of the planking forced down by a blow. "The wood was what we call rotten, soft." He testified that one way to test wood in boats was to stick a knife in the wood, and what he called soft planks were planks where the whole nature of the wood was destroyed through neglect and age. He also testified that the end of this plank, that was forced down, was down about four inches; that the outboard spike was pulled three-fourths of the way *through* the plank, and was broken off and very much rusted; that the inboard spike was pulled practically *right through* the plank; that it is impossible to corrode a spike in water, except through a series of years.

Accordingly, I find that, while the Graney No. 4 was seaworthy on the facts presented in this case, yet she had such a tender bottom that it was carelessness in those who should have reasonably known this condition, and under all the circumstances, to moor her alongside the rough stone bulkhead at Seventy-Second street without taking such ordinary precautions against the plainly to be apprehended danger of swells, both large and small. Such evidence of due care required under the circumstances is lacking.

The bulkhead was a public dock, and the Graney No. 4 was rightfully moored there. This, however, in no way affects the obvious character of the place.

There is no indication to me, on the evidence here, that the Graney No. 4 was injured by reason of her work. On the contrary, I think it is not only probable, but plainly indicated, that she was injured by reason of the swells of the Silvia, which were unusually heavy, pounding her against the stone bulkhead, when the Silvia carelessly passed so close and at an excessive speed, and that while, with her tender bottom and the condition under which she was handled, she was more susceptible at that time to damage than a boat with a better bottom would be, a condition which should have been considered by her owner, yet she was seaworthy. She had been there a week without evidence of any damage, and the traffic up and down the river must have had its small and large boats.

Violations of a statute, while relevant, are not necessary to find, where all the circumstances indicate a probable cause of injury or fault indicating negligence. I find, therefore, after carefully considering all the evidence and the probabilities appearing therefrom, that the Silvia was negligent, and that its negligence was a proximate cause for the injury to libelant's boat, and I also find that the libelant was at fault as above set forth, and that this fault materially contributed to the accident and the damage.

[4] I am fairly satisfied that the fault of the libelant occasioned the damage to a greater degree than the fault of the Silvia; but, both parties being found in fault under the rule governing this court, I cannot apportion the damage according to the degree in which they were to blame. "If there is blame causing the accident on both sides, they are to divide the loss equally." Cayzer v. Carron Co., 9 App. Cas. 873; The Catharine, 17 How. 170, 15 L. Ed. 233; The North Star, 106 U. S. 17, 1 Sup. Ct. 41, 27 L. Ed. 91.

Accordingly I decree that the damage be divided.